### Case No. 9,171.

#### MARTIN et al. v. The WILLIAM.

[Oliver's Forms (Ed. 1842) 474.]

District Court, D. Massachusetts. April, 1819.

SEAMEN—WAGES — FORFEITURE — INCONSIDERATE TREATMENT—INTENTION.

[Rebellious and disobedient conduct on the part of a ship's crew will not be held to justify a total forfeiture of wages where such conduct was caused, more or less, by inconsiderate treatment on the part of the ship's officers, and was the display of a sudden irritation thereat, and not of a deliberate purpose to disobey.]

The libel was for $100 apiece as wages and compensation for having been kept on

short allowance. The respondents [George Bachelor, master, and B. F. Pickman and others, owners, of the William], in their answer admitted there would have been due to the libellants, if they had discharged their duty as follows, namely: to John G. Martin, $63.26; William Jackson, $79.26; James Oliver, $87.71; Thomas Hay, $88.83; Andrews Armstrong, $85.65; but allege, that the libellants have forfeited their wages by neglect of duty and disobedience of orders, resistance to the lawful authority of the officers, and mutinous conduct.

James T. Austin, for libellants.

George Blake and George Sullivan, for respondents.

DAVIS, District Judge. The libellants demand balances of wages alleged to be due them respectively, for their services as mariners, on board the ship William, in a voyage from Boston to Calcutta, and back to Boston. The voyage was performed between the 22nd of February, 1818, and the 11th of February last, when the ship arrived at Boston. The engagement and services on board are not disputed, but the respondents contend that the wages, which would otherwise be due to the libellants, are forfeited by their violent and mutinous conduct on the 24th of October, and on the 30th of January last. An instance of disobedience is also offered in evidence, and, in a degree, urged at the hearing, which is asserted to have occurred at Calcutta, in July. It is not stated in the answer to the libel as one of the grounds of forfeiture, and seems to have been principally relied on in argument, as indicating an unruly disposition in those of the crew who are implicated in the charge. All the libellants, excepting Martin, are named in the log-book as culpable on that occasion.

In disputes which happen on board ships at sea, and especially in those wherein acrimonious feelings of hostility are engendered, the officers and crew taking different sides, it is generally extremely difficult to obtain a precise view of controverted facts. In this case, the mutual resentments excited on the voyage have been inflamed by proceedings since the return of the ship; and from the colorings which such occurrences naturally induce it is not easy to determine satisfactorily the true features of the transaction.

The affair of the 24th of October, commenced with a dispute, resulting in a violent affray of considerable continuance, between Isaac Bradford, the mate, and James Brown, one of the seamen. Brown was at the helm about 8 o'clock in the morning of that day, and, on being told by the mate that the ship was not in her exact course, but that the sails were shaking in the wind, he questioned the truth of the remark. An altercation on this subject, in which the mate's opinion was pertinaciously opposed by Brown, ended in blows. The first blow was given by the mate. The parties were soon locked together on the quarter-deck, giving and receiving blows, and exercising other modes of mutual annoyance. Armstrong was on the quarter-deck at the time, and either took part with Brown, or was endeavoring to relieve him, when Captain Bachelor, Mr. Smith, the supercargo, and Hay, the second mate, came up on deck. Armstrong was taken off from Bradford by the captain, and went forward. So also did Martin and Oliver, who, as Mr. Smith testifies, were on the quarter-deck when he came up from the cabin, and whom he ordered to go forward. The conflict continuing, Brown cried, "Murder!" Some of the witnesses say that this cry was repeated, and one of them, Taylor, exclaimed to the crew below, that "the mate was killing Brown." The eager attention of the whole crew was called to what was passing. With few exceptions, they advanced to the quarter-deck, avowedly with an intention of relieving Brown. The captain and officers ordered them to keep back, and for the purpose of maintaining the command of the quarter-deck, and to repel the approach of the men, some of whom were furnished with offensive weapons, the captain had his pistols brought up from the cabin, and the mate seized a capstan bar, which, when he went below for the pistols, he gave to the supercargo. The men made a pause at the gangway, and did not advance further. The two combatants, after a struggle of several minutes, in which the mate had the advantage, were separated by the captain. Brown went forward and washed the blood from his face. After a consultation between the captain and mate, he was soon ordered aft, to be put in irons. He made show of resistance to this order, and some intemperate language was uttered by one of the libellants. Martin, however, advised him to submit. Brown was accordingly put in irons, without resistance or opposition from any of the crew, and so remained three days, with a scanty allowance of bread and water.

In this affair though much sympathy was manifested by the libellants, and by the rest of the crew, with their comrade, Brown, the authority of the captain or officers was completely maintained, and though the interference of the men, for the relief of Brown, was in an unusual and imposing manner, yet the impetuous movement seems to have been seasonably checked, without actual force or violence having been committed by the libellants or any of the crew.

No further difficulty occurred until the 30th of January. The men, being below at dinner on that day, were called upon by Hay, the second mate, to haul out the bowlines. Martin first came up with his knife, which he had used at his dinner, in his left hand. The dinner, it appears, had not been satisfactory. It was a day on which pork had usually made part of the meal. Of this article, for some reason, which is not explained, they were on that day deprived; and the unpalatable rice, without its

usual seasoning, had been the subject of complaint among them while at dinner. Martin was uttering some indistinct murmurs on this account, when he came upon deck, and looking at the captain, who was walking on the quarter-deck, used some abusive language in regard to him, intimating a determination to have satisfaction at some future time. The second mate said to him, "Who are you damning, and what are you grumbling about?" "What is that to you?" replied Martin, with a coarse argument too common among men of this class. The captain, hearing this reply, came forward, and ordered Martin to go aft. He refused to obey the order. It was the determination of the captain that he should be put in irons. In attempting to compel Martin to go aft, as required, the captain seized him by the collar. The two mates say that Martin first seized the captain in that manner. It is difficult to reconcile the testimony as to this fact. It was evident that it was the captain's intention to compel obedience to his order, and that Martin should be put in irons for his offensive language and deportment, and it appears probable that the mutual seizing by the collar was cotemporaneous. Bradford the mate, accompanied the captain, and assisted him in the struggle which ensued. On the other hand, the other four libellants engaged in Martin's assistance. In this operation, Bradford was pressed violently against the rails; and he is persuaded that nothing but very great efforts, by himself and the aid of the captain, prevented his being thrown overboard. Captain Bachelor was struck in the contest by Jackson, to whom he had given a blow with his flat hand. The parties, being at length disengaged, the purpose of compelling Martin to go aft, to be put in irons, was abandoned. Jackson, after the struggle, was ordered aft, but refused to obey, declaring that "he would see any man's heart's blood who should attempt to put him in irons." The officers deliberated on the state of the ship, and appear to have been in a state of alarm, and apprehension. Captain Bachelor said that he had no confidence in his crew, and a consultation ensued on the expediency of proceeding to Bermuda, or to Charleston, the nearest port in the United States. It was determined, however, to hold on their course to Boston, being careful to keep loaded arms constantly at hand, to be employed in case of an emergency, which they thought they had reason to expect. The officers were directed by the captain not to order Jackson or Martin, who were considered as the greatest offenders, to do any duty on board the ship. They were, however, occasionally employed, and took their turns in steering, though not in consequence of any orders given to them by the officers. No disorder or uneasiness afterward took place on board the ship during the twelve subsequent days that she was at sea.

It remains to consider how this culpable conduct is to be estimated in reference to the seamen's contract, and whether it shall operate, as the respondents contend it should, to the forfeiture of the wages of the libellants who were concerned, with more or less aggravation, in both affairs. The rules and principles applicable to this peculiar subject, the offences of seamen, require a full view and consideration of all the circumstances attending the transactions. These men undoubtedly committed an offence, but if there exist any circumstances in extenuation, or mitigation, they have a legitimate operation in their behalf, which the court is bound to regard.

The first remark which I would make, in respect to these two instances of disorder, is that they do not appear to have been the result of any preconcert, or premeditation, but were of sudden emergence, from unexpected circumstances. In the origination of the first affair these men had no concern. I cannot say that the mate was without fault in that instance. The conduct of Brown was, no doubt, impertinent and irritating; but some other and more deliberate mode of punishment should have been adopted than a blow with the fist, especially while the man was at the helm. The violence of the contest which ensued, was such as might have been expected from the intemperate passion with which it commenced. The mate was of superior strength. Cries of murder were uttered by Brown. It was proclaimed that the mate was killing him. The crew, who hastened to his relief, were undoubtedly wrong in part of their conduct on that occasion, especially in assuming offensive weapons; but they evidently were under the operation of sudden excitement, and were impelled by sympathies which have claims to a liberal consideration, unless there should be found combined with them a malignant and mutinous temper. I do not see evidence of that exceptionable disposition in this transaction. The sudden check to the advance of the crew should not be attributed altogether to the arms, or to the physical force opposed to them. A respect to authority should be admitted as having an influence in their minds, and in the midst of their impetuous burst of feeling, they had regard to their station and to their duties. Brown, after returning to his companions, and having washed off the blood with which he was disfigured, was soon called into the presence of the officers to be put in irons. There was no opposition to this severe act of discipline. He was advised by Martin to submit to it when manifesting some natural reluctance to that mode of confinement. This circumstance should be viewed as evidencing a prevalence of principles of subordination among the crew at that period and may lead us to impute the preceding angry appearances to sudden excitement and sympathy. There was an immediate return to duty, and if there was no subsequent misconduct, this transaction

might be fairly considered, I think, as overlooked and forgiven, as in my opinion it ought to have been, from principles of common prudence, a discreet regard for the successful prosecution of the voyage, as well as from the general considerations applicable to cases of this description.

The second disturbance appears to me to have been much more reprehensible. But, even in regard to this, there are some mitigating circumstances, which ought not to be disregarded. It originated in discontents respecting provisions. "Though mariners and soldiers," says Molloy, "have just cause of complaint, as that their victuals or provisions are not good, yet they must not mutiny and rebel, whereby to distract and confound the whole crew, but must make a civil and humble address 'to their commander, that the same may be amended; and, if the case be such, that the commander cannot redress the same, they must like men bear with the extremity." The first discontent on board the William in regard to provisions appears to have been manifested in the manner which the authority enjoins, and which propriety dictates to the most uninstructed minds. The beef with which the ship was supplied, from defect in quality, or some other cause, was much disliked by the crew. They reckoned, therefore, very much on the two pork days, as they were called, Tuesday and Friday. On the Tuesday preceding the 30th of January, the quantity of pork at their dinner was so small, that an appeal to the captain was made on the subject. Instead of experiencing any beneficial change from the application, on the next pork day, which was the day of the disturbance, they had no pork at their dinner. This produced discontent at their meal, and they were especially dissatisfied with the insipidity of the rice, being without its usual relish, and without sugar, which, they thought, should have been substituted, if pork, which they preferred, should not be furnished.

From all that appears in the case, I cannot but think that a greater degree of attention to the wishes of the men, in this particular, would have been more prudent and reasonable. There would have been no loss of dignity, in an accommodation to expectations, which do not apear to have been immoderate, and were distinctly, though respectfully, expressed. The indulgences of mariners at sea are necessarily brief and few; but such as they are they cannot be abridged unnecessarily or negligently, without risk of disturbance; and a discreet regard to reasonable expectations on this head is a cheap and easy mode of acquiring cheerful obedience and submission to the severest duties of the employment. Inevitable privations are met with fortitude; but unnecessary or capricious curtailments are the sure incitements of resentment and ill will.

It would have been better, perhaps, not to have taken offense at the murmurings of Martin, or of any of the crew, when in a state of mind, which, it would seem, might have been anticipated; especially as the order which was given, was executed without delay; and in regard to Martin's intemperate language, part of which was in a degree equivocal, some more deliberate mode of punishment, I think, might have been selected to better effect, than that which was adopted. Still, the maintenance of authority on board of vessels at sea, though it may be harshly urged, is indispensable. The captain's order should have been obeyed, and whatever reluctance might have been manifested at submission to the threatened punishment, no man should have interposed to prevent its execution, unless by respectful request or representations. Mariners should understand this to be their duty most distinctly, and if the measures adopted by their commander be unnecessarily severe, due recompense is to be sought from the proper authorities, upon the arrival of the vessel.

Making every allowance, therefore, for the differences in testimony, as to some particulars of this disturbance, I must consider the conduct of the libellants as very exceptionable; but I cannot consider it when all circumstances are taken into view, as operating a forfeiture of their whole wages." The position laid down in Abb. Shipp. has been urged, that "what will justify a master in discharging a seaman, during the voyage, will also deprive the seaman of his wages." We do not gain any precise direction by this doctrine. Before it can serve as a guide, we have to apply the facts of the case to the question whether they would authorize a discharge of the men, if the ship were in a situation in which a discharge were practicable. Now, on the facts in this case, if the ship were in port, the voyage unfinished, I should doubt whether the master could have compelled the men to take a discharge, or a discharge which should deprive them of past wages, provided they should have signified proper repentant dispositions, and there should have been sufficient grounds to infer that there might be a reliance on their future good conduct. In estimating the confidence that could have been placed in them, I cannot but observe that, excepting in the two particulars relied on in the defence, and the transient and comparatively trivial instance of misbehavior at Calcutta, the history of the voyage evidences the good deportment of the men. They have performed the services required by their engagement, faithfully and uniformly, during a long voyage, and under circumstances of more than ordinary hardship and exertion.

The letter to the captain which was produced at the hearing, and all the circumstances occurring when the ship was about sailing from Calcutta, appear to me, when fairly considered, not unfavorable to these men. They pleaded the captain's declara-

tion of a willingness to discharge them on request, and proceeded to solicit a discharge, provided the lading should be augmented to a degree which they thought unsafe. This was after the ship had put back, in consequence of a leak, and when it had been manifested that she had been overladen, and a portion of the sugars had been discharged. After a communication with the captain, the men adhered to the ship, though not without concern, and after the additional lading, which they objected to, had been put on board. The state of the ship, on the return voyage, seems to prove that the apprehensions of the crew were not altogether groundless. At any rate, I cannot but think that the concern which they expressed was genuine, and that the indications manifested in that particular, ought not to be imputed to a turbulent and unreasonable temper.

In the case of Johnson v. The Columbus [unreported] I had occasion to remark on the spirit, which it is allowable, and even requisite to introduce in causes of this description. The general considerations, expressed in that case, are applicable to this, and I shall not now repeat them. Dating from the earliest precedents, the law, in regard to the offences of seamen, admits of the reasonable operation of clemency. This is an ingredient intimately interwoven with the whole doctrine on this subject. "At the same time," as Sir William Scott observes, "this must not be understood, as if the court would show such a blind indulgence as should overrule the real justice of the case; it is only such an indulgence as the equitable considerations of public utility require, which can seldom, in such cases, any more than in others, be separated from particular justice."

From a full view of the conduct of the libellants, I cannot but consider them as very culpable, but not in an equal degree; and the mulcts, which I think I am bound to impose, will correspond to that diversity. Martin and Jackson, I shall view as not earning wages, after the 30th of January, and shall deduct three months' pay from the amount previously earned by them. Two months' pay will be deducted from the wages of Oliver, Hay, and Armstrong, each party to sustain their own costs. It will be understood, that in these deductions, applied as mulcts for the offences of these men, I do not impute to them the very atrocious design, which the mate supposes they meditated against him, in the affair of the 30th of January. I have no doubt of the reality of his apprehensions; but I do not see sufficient evidence, to authorize a conviction, that the enormity suggested was intended.

Some of the considerations, which have been expressed in giving an opinion on this case, would probably have had an operation to mitigate the demand, which has been made, of an entire forfeiture of wages, if some circumstances, peculiarly irritating, had not been adopted against the officers, soon after the arrival of the ship. The death of Brown, which happened soon after the arrival, was imputed to the officers, and a charge of murder was instituted against them. From the imprisonment consequent on the first examination on that charge, they have been liberated. From all that has appeared on this hearing, I see no ground for such an imputation. It is said that the charge was made by a relation of the deceased, and not by any of the crew. It would appear, upon the facts now disclosed, that the said prosecution could not have originated without exaggerated representations on their part. Whatever might have been their views on this subject, it is evident from the testimony of Dr. Warren, that Brown's death could not have been occasioned by any injury sustained in the affray with the mate. It was from a cause which brings many victims to a premature grave. Dr. Warren who examined the body of the deceased, testifies that he never witnessed more decided marks of disease from the intemperate use of ardent spirits. This question, however, has no intimate connection with this suit; but it having been introduced, what I have said has appeared to me to be required by the occasion.

NOTE. The decree of the judge was that, as the balance of wages, Martin recover $34.42; Jackson, $48.42; Hay, $71.84; Armstrong, $67.71; Oliver, $64.78; and each party pay his own costs. Mutinous and rebellious conduct on the part of a seaman will justify the master in ejecting him from the duty of the ship. This will be a legal cause to refuse payment of his wages after his discharge, but, an acceptance of his services afterwards, will operate as a forgiveness of his offence, and a reinstatement in his former position. Relf v. The Maria [Case No. 11,692]; The Mentor [Case No. 9,427]. In some very aggravated cases, it would seem that all the wages due would be forfeited, if there had been no compromise or re-acceptance of service. Habitual intoxication so as to incapacitate a seaman for the discharge of his duty, habitual disobedience of reasonable commands, general neglect of duty, it would seem, will operate a forfeiture of wages; but not a single act. See The Mentor [supra] and the authorities there cited. But after a sufficient cause for forfeiture of wages has occurred, if the master, from the necessity of the case, has been obliged to retain the refractory seaman, it will not, of itself, operate as a forgiveness of his offence; and, therefore, the forfeiture will remain with its fullest effect.